IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **MAURICE A. MOORE,** | ) | **CASE NO. 4:04CV3138** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **CITY OF LINCOLN,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on filing no. 38, the Motion for Summary Judgment filed by the remaining defendant in this case, the City of Lincoln, Nebraska, and filing no. 41, the Opposition to Summary Judgment filed by the plaintiff, Maurice Moore. The plaintiff brought this civil rights action pursuant to 42 U.S.C. § 1983, alleging that Lincoln police officers used excessive force in the course of the plaintiff's arrest, in violation of the Fourth Amendment to the United States Constitution.

Lincoln police officers arrested the plaintiff on June 25, 2002, for assaulting police officers, resisting arrest, disturbing the peace, trespassing, and failing to comply with a lawful order. The Lancaster County Attorney charged the plaintiff with two counts of assault on a police officer and two habitual criminal charges. However, the plaintiff spent a considerable period after his arrest committed to the Lincoln Regional Center, after a Lancaster County District Judge found the plaintiff incompetent to stand trial. The plaintiff's treating physician at the Lincoln Regional Center diagnosed the plaintiff's mental condition as "paranoid delusional disorder." Over the following year, the plaintiff's treating physician reported to the Lancaster County District Court that the plaintiff remained incompetent to

1

stand trial and that his clinical condition involved a very systematized chronic paranoid delusion, which would be unlikely to change in the foreseeable future, particularly in light of the plaintiff's unwillingness to take antipsychotic medication. Eventually, the prosecutor dismissed the charges in light of the plaintiff's incompetence to stand trial.

Although the plaintiff alleges excessive force in the course of his arrest, none of the arresting officers remains a defendant in this case, as the plaintiff served only the City with process. The plaintiff named among the defendants, Thomas K. Casady, the City's Chief of Police. Because the plaintiff did not expressly purport to sue Casady in his individual capacity, suit against Casady, in his official capacity *only*, is presumed. See, e.g., Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999): "Because section 1983 liability exposes public servants to civil liability and damages, we have held that only an express statement that they are being sued in their individual capacity will suffice to give proper notice to the defendants."

A suit against a public employee in his or her official capacity is treated as a suit against the public employer. Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). Therefore, the claim against Casady, in his official capacity, is in reality a claim against the entity that employs him -- the City of Lincoln in this case. See, e.g., Wilson v. Spain, 209 F.3d 713, 717 (8th Cir. 2000) ("The claims against then-Chief Jones and Officer Spain in their official capacities are tantamount to claims against the City of Rogers"), *citing* Kentucky v. Graham, 473 U.S. at 166. Filing no. 7, the return of service on Casady, shows that the summons and complaint were served by certified mail on the Mayor of Lincoln. That form of service complies with Neb. Rev. Stat. § 25-510.02(2) for service on

2

Casady in his official capacity, i.e., service of process on the City.[1]

Thus, the only remaining defendant in this civil rights action is the City of Lincoln. However, there can be no imputed or vicarious liability premised on 42 U.S.C. § 1983. A municipal entity may not be held liable on principles of respondeat superior for constitutional injuries allegedly inflicted by other persons. See, e.g., Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 778 (8th Cir. 2001), *citing* Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 405 (1997), and City of Canton v. Harris, 489 U.S. 378, 385 (1989). Accord Cummings v. City of Akron, 418 F.3d 676, 684-85 (6th Cir. 2005): "[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." See also Dye v. Wargo, 253 F.3d 296, 299 (7th Cir. 2001): "In litigation under § 1983 a municipality is not vicariously liable for the constitutional torts of its employees but is answerable only for the consequences of its policies."

"[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." Avalos v. City of Glenwood, 382 F.3d 792, 802 (8th Cir. 2004) (citation omitted). "A city may be sued directly under § 1983 where 'the action that is alleged to be

---

[1]A city may be served by service of process on the Mayor or City Clerk. See Neb. Rev. Stat. § 25-510.02(2), regarding "[s]ervice on state or political subdivision:"

....
(2) **Any county, city, or village of this state may be served by personal, residence, or certified mail service upon the chief executive officer, or clerk.**
....

(Emphasis added.)

unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the city's] officers.'" Kuha v. City of Minnetonka, 365 F.3d 590, 603 (8th Cir. 2003) (citation omitted). "Official policy involves 'a deliberate choice to follow a course of action ... made from among various alternatives' by an official who [is determined by state law to have] the final authority to establish governmental policy." Id. at 604 (citation omitted).

As opposed to an official policy, municipal liability may also rest on a pervasive, although unofficially adopted, custom. "[Municipal] liability also attaches 'for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" Id. at 603 ("misconduct so pervasive among non-policymaking employees of the municipality 'as to constitute a "custom or usage" with the force of law'"). "'[C]ustom or usage' is demonstrated by:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
>
> (2) Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
>
> (3) Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, i.e., [proof] that the custom was the moving force behind the constitutional violation."

Id. at 604 (citations omitted).

In this case the plaintiff challenges the City's official policy governing the use of force by officers of the Lincoln Police Department. The plaintiff states that in the course of his arrest, Lincoln police officers handcuffed him and locked him in a police car without

4

advising him of his Miranda rights. The officers also used pepper spray to subdue him while he was handcuffed and in the back seat of the police car. Finally, the officers administered blows to the plaintiff's head and neck and kicks to his legs, while the plaintiff was still handcuffed. The plaintiff objects to the policy by which the City of Lincoln authorizes police officers to use those techniques in his circumstances.

The applicable "Use of Force" policy is codified as General Order 1510 of the Lincoln Police Department (see filing no. 40, Attachment "A" to Affidavit of Terrence Sherrill). General Order 1510 authorizes increasing levels of force to match the levels of force or forcible resistance to arrest used by a suspect. Lincoln police are required to receive training and continuing education regarding the use of force.

### Summary Judgment Standard

Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327(1986). With respect to a motion for summary judgment, the court must examine the record in the light most favorable to the nonmoving party. See, e.g., Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. at 323. In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." Id. at 586.

"[T]he mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment as a matter of law .... Instead, 'the dispute must be outcome determinative under prevailing law.'" Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted). Accord Dico, Inc. v. Amoco Oil Co., 340 F.3d 525, 529 (8th Cir. 2003). "If the evidence is merely colorable ... or is not sufficiently probative ... summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

When reviewing the record in connection with a motion for summary judgment, the court may not weigh the evidence, determine credibility, or decide the truth of any factual matter in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; Tatum v. City of Berkeley, 408 F.3d 543, 549 (8th Cir. 2005). However, the court may consider only those materials which are admissible or usable at trial. See, e.g., Mays v. Rhodes, 255 F.3d 644, 648 (8th Cir. 2001): "While we review the record in the light most favorable to [the nonmoving party], we do not stretch this favorable presumption so far as to consider as evidence statements found only in inadmissible hearsay." Accord Erickson v. Farmland Industries, Inc., 271 F.3d 718, 727-28 (8th Cir. 2001) (unsworn out-of-court statements were hearsay and, as such, could not be considered at the summary judgment stage of the

plaintiff's age discrimination case).

In addition, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Thus, the plaintiff must point to sufficient factual evidence on which a jury could return a verdict that a City policy or custom constituted the moving force behind a constitutional injury inflicted on the plaintiff.

## Fourth Amendment Standard

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest. Graham v. Connor, 490 U.S. 386, 394-95 (1989). On the other hand, an arrest necessarily carries with it the legal authority to use reasonable force to accomplish the arrest. Id. at 396. Accord McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003) (Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.). (Citations and quotation marks omitted.)

As to what constitutes an "excessive" degree of force, see generally Littrell v. Franklin, 388 F.3d 578, 583-84 (8th Cir. 2004):

> We analyze excessive force claims related to arrests under the Fourth Amendment. E.g., Graham v. Connor, 490 U.S. 386, 395 (1989). To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, "the test is whether the amount of force used was objectively reasonable under the particular circumstances." Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 .... The Supreme Court has instructed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are

7

tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Id. at 396-97 .... "**Circumstances such as the severity of the crime, whether the suspect posed a threat to the safety of the officers or others, and whether the suspect was resisting arrest are all relevant to the reasonableness of the officer's conduct**." Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1081 (8th Cir. 1990). "**In addition to the circumstances surrounding the use of force, we may also consider the result of the force**." Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1007 (8th Cir. 2003); Patzner v. Burkett, 779 F.2d 1363, 1371 (8th Cir. 1985) (stating that, in considering the reasonableness of force used, the extent of any resulting injuries is relevant).

(Emphasis added.)

Lincoln police officers Bay and Kaufman responded to a police radio dispatch concerning a disturbance caused by a person banging on the door and windows of the reporting party's apartment. After speaking with the complaining party, Bay and Kaufman found the plaintiff crouching between parked vehicles in the parking lot of the building. The officers identified themselves as police and asked to see the plaintiff's hands. The plaintiff did not comply. However, as the plaintiff moved toward the officers, they could see that the plaintiff did not have a weapon in his hands. When the officers informed the plaintiff that he would be detained for a short time until the complaint could be "sorted out," the plaintiff became upset and, in the officers' words, "resisted." When the officers attempted to place handcuffs on the plaintiff, he locked his arms and pulled away. Officer Bay did manage to handcuff the plaintiff, and the officers placed him in the back seat of a police cruiser.

### Handcuffs

Pursuant to General Order 1510, persons detained or arrested and taken into custody are to be handcuffed unless, among other conditions, an arrestee does not

represent an apparent risk to others and is incapacitated, in which event use of handcuffs is in the discretion of an arresting officer.

The foregoing parts of General Order 1510 are entirely reasonable and did not cause any constitutional injury in Mr. Moore's case. That Officers Bay and Kaufman, in their discretion, were authorized to place handcuffs on the plaintiff in the absence of a visible weapon, is not unreasonable and does not violate the Fourth Amendment. The officers needed time to identify the plaintiff and to investigate the complaint against him. As the complaint against the plaintiff and the officer's observations suggested irrational and unrestrained behavior, the officers were not unreasonable to secure the plaintiff for their safety and his own.

### Miranda Rights

The plaintiff complains that the officers failed to "read him his rights," see Miranda v. Arizona, 384 U.S. 436 (1966),[2] before they placed the plaintiff in the police car. General Order 1510 does not address the obligation to administer Miranda warnings. However, the court must still determine whether the plaintiff has presented a factual issue for trial regarding a compensable injury to the plaintiff's Fifth or Sixth Amendment rights.

The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings, and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel. Manning v. Bowersox, 310 F.3d 571, 575 (8th Cir. 2002), cert. denied, 538 U.S. 1035 (2003); United

---

[2]In Miranda v. Arizona, 384 U.S. 436 (1966), the United States Supreme Court held that before police may interrogate a suspect who is in custody, the officers must inform the suspect of the Fifth Amendment right to remain silent and the Sixth Amendment right to an attorney.

States v. Moore, 122 F.3d 1154, 1155-56 (8th Cir.1997), cert. denied, 522 U.S. 1135 (1998). Therefore, the Sixth Amendment right to counsel had not yet attached when the officers placed the plaintiff in the police car, and the plaintiff suffered no injury to his Sixth Amendment right to counsel by his detention in the police cruiser without Miranda warnings.

As for the Fifth Amendment, the record does not indicate whether the plaintiff ever made any incriminating statements in the course of his detention. In addition, in Chavez v. Martinez, 538 U.S. 760 (2003), the United States Supreme Court ruled that a § 1983 claim for damages does not lie against officers who wrongfully coerce a suspect to supply incriminating information that is never used in a criminal prosecution. Inculpatory statements wrongfully compelled by police interrogation may not be used against a defendant at trial, but it is not **until** their use in a criminal case that a violation of the Self-Incrimination Clause of the Fifth Amendment occurs. Id. at 766-73.[3] Because of his mental condition, the plaintiff could not be tried. Therefore, the plaintiff sustained no compensable injury to his Fifth Amendment rights.

### Escalation of Force

Construing the record in the light most favorable to the plaintiff and giving the plaintiff the benefit of every factual inference, the handcuffs used to restrain the plaintiff

---

[3]Thus, coercion alone does not violate the Self-Incrimination Clause; the Clause is violated by use of the compelled statements in a criminal case against the witness. The same is true of statements elicited without Miranda warnings; no injury occurs absent use of the statements in a criminal case. Chavez v. Martinez, 538 U.S. 760 (2003) holds that a violation of the constitutional right against self-incrimination occurs only when a defendant has been compelled to be a witness against himself in a criminal case.

were too tight. In fact, the plaintiff asserts that the handcuffs left scars, although it is unclear whether they would have done so if the plaintiff had simply remained quietly in the back seat of the police cruiser.

Instead, the plaintiff lay back in the car seat and attempted to kick out a window of the cruiser. While speaking with the complaining witness, Officer Bay heard "banging" and saw "what appeared to be feet" coming out of the rear window of his police cruiser. He and Officer Kaufman ran to the vehicle, yelling "stop" to the plaintiff.

At the police car, the officers decided that they would have to restrain the plaintiff's legs and feet. General Order 1510 authorizes leg restraints when a detainee or arrestee represents an escape risk or is combative. The officers called for assistance, and another police unit responded to dispatch that they were en route. However, at that point, the plaintiff resumed kicking the police cruiser. The officers opened one or both back door(s) to the vehicle to attempt to pull the plaintiff out so that they could place leg restraints on him, but they were unsuccessful. Moore managed to kick both officers several times.

### Pepper Spray

At that point, Officer Bay sprayed pepper spray into the back seat area of the police car where the plaintiff was still struggling to prevent his removal from the vehicle. General Order 1510 authorizes the use of aerosol oleoresin capsicum ("OC" or "pepper spray") among other intermediate weapons to counteract active aggression in the "resistance control continuum" which is the essence of the use of force policy. At the point Bay sprayed pepper spray into the back seat of the cruiser, the plaintiff had moved beyond a mere threat of property damage to the cruiser to actively struggling with and kicking the officers.

Other courts have evaluated the constitutionality of the use of pepper spray to subdue a suspect in similar circumstances.  See, e.g., McCormick v. City of Fort Lauderdale, 333 F.3d 1234 (11th Cir. 2003).  The Constitution does not require advance warning before the application of pepper spray.  Id. at 1244.  "Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others.  Shock and surprise may be proper and useful tools in avoiding unnecessary injury to everyone involved when dealing with potentially violent suspects."  Id.  See generally Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1105 (8th Cir. 2004) (officer did not use excessive force in applying pepper spray in the course of a lawful traffic stop when driver refused to exit the vehicle after repeated instructions to do so); Monday v. Oullette, 118 F.3d 1099, 1104-05 (6th Cir. 1997) (upholding police officer's use of pepper spray to subdue an unarmed individual the police feared would injure himself or commit suicide if not taken into custody).

### Blows to the Plaintiff

The single application of pepper spray into the back seat of the police vehicle did not subdue the plaintiff.  The officers continued in their efforts to remove the plaintiff from the vehicle in order to place leg restraints on him.  Bay used brachial stuns (a striking technique causing momentary motor dysfunction or distraction used to get someone down).  Kaufman attempted front kicks to the plaintiff's common peroneal nerve, which runs along the exterior of the thigh above the knee, as the plaintiff kicked at the officers.  Kaufman did kick the plaintiff but was ineffective to stop the plaintiff's kicking at the officers.

Then the plaintiff escaped from the vehicle and "took off on foot" with the officers in close pursuit, yelling at him to stop.  Kaufman grabbed the plaintiff's shirt, which slowed

12

the plaintiff down enough for Kaufman to tackle him. Once Kaufman was able to tackle the plaintiff and take him to the ground, the officers lay on top of the plaintiff until other officers arrived to provide assistance. With the arrival of the additional officers, the plaintiff was finally secured in leg restraints and again placed in a cruiser. In all, it took six officers to subdue the plaintiff and prepare him for transportation to jail.

It is clear from the plaintiff's submissions that he believed officers Bay and Kaufman were trying to murder him. However, it is also clear from the record that each escalation of force by the officers was precipitated by an action taken by the plaintiff. The plaintiff has pointed to no defect in the City's policy governing the use of force, and the policy itself requires no more force than is necessary to control a situation such as that involving the plaintiff.

"'[T]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight.'" McCormick v. City of Fort Lauderdale, 333 F.3d at 1244 (citation omitted). General Order 1510 of the Lincoln Police Department incorporates those principles and calls for no more force than is reasonably necessary to control a suspect, such as the plaintiff, who exhibits combative and aggressive behavior and who resists efforts to take him into custody. In the plaintiff's favor, the officers may have erred in handcuffing the plaintiff too tightly. However, the plaintiff's conduct thereafter precipitated each escalation of force. Thus, in this case, the plaintiff has not shown a causal link between a policy or custom of the City of Lincoln and a violation of his constitutional rights. Summary judgment will be granted in favor of the City, and the plaintiff's complaint and this action will be dismissed with prejudice.

IT IS ORDERED:

1. The Motion for Summary Judgment filed by the remaining defendant, the City of Lincoln, Nebraska (Filing No. 38) is granted;

2. All other pending motions and objections are denied as moot; and

3. A separate judgment will be entered accordingly.

DATED this 16th day of December, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge